163 Cal.App.4th 359 (2008)
MARTIN A. STEINER, Plaintiff and Appellant,
v.
PAUL THEXTON, as Trustee, etc., Defendant and Respondent; SIDDIQUI FAMILY PARTNERSHIP, Intervener and Appellant.
No. C054605.
Court of Appeals of California, Third District.
May 28, 2008.
*362 Law Office of Robert Vaughan and Robert Vaughan for Plaintiff and Appellant.
Law Office of Klaus J. Kolb and Klaus J. Kolb for Intervener and Appellant.
Law Office of David L. Price and David L. Price for Defendant and Respondent.

OPINION
SIMS, Acting P. J.
In this action seeking specific performance of a real estate sales agreement, the hopeful buyer, plaintiff Martin A. Steiner, and his partial assignee, intervener Siddiqui Family Partnership, (collectively, plaintiffs) appeal from a judgment, following a bench trial, entered in favor of the property owner, defendant Paul Thexton, as trustee for the FAS Family Trust (Thexton). Plaintiffs contend the trial court erred in construing the contract as an unenforceable option to buy the property, void for lack of consideration, *363 and in awarding attorney's fees to defendant. We shall affirm the judgment and the attorney's fee award.

FACTUAL AND PROCEDURAL BACKGROUND
On October 20, 2004, Steiner filed a complaint seeking specific performance of a "REAL ESTATE PURCHASE CONTRACT."
Thexton filed an answer, asserting a variety of defenses, including a defense that the "contract" was a disguised option, void for lack of consideration.[1]
On March 21, 2006, Siddiqui, with leave of court, filed a complaint in intervention, based on Steiner's partial assignment of his rights under the "contract" to Siddiqui, pursuant to an agreement for Steiner and Siddiqui to participate in the expenses of the effort to subdivide the property. Siddiqui sought specific performance. Siddiqui's complaint also sought damagesfor capital gains taxes it owed on the sale of other property, which it planned to defer by using the money to buy Thexton's property in a "1031 exchange" under the Internal Revenue Code. However, Siddiqui later withdrew the claim for monetary damages, asking instead for reformation of the Steiner/Thexton agreement to allow additional time to pay Thexton.
As adduced in the bench trial, Steiner, a real estate developer, was interested in buying and developing several residences on a 10-acre portion of Thexton's 12.29-acre parcel. In order for this to happen, county approvals for a parcel split and development permits were required. Steiner approached Thexton, who had not been interested in selling the property on which he resided, but considered selling a portion of the property. Thexton had previously turned down an offer from a different party for $750,000, because that party wanted Thexton to obtain the required approval and permits. The agreement between Thexton and Steiner, which was prepared by Steiner, was for Thexton to sell the 10-acre portion to Steiner for $500,000 by September 2006, if Steiner decided to purchase the property after pursuing, expeditiously and at Steiner's own expense, the county approvals and permits. However, the "contract" also provided that Steiner was not obliged to do anything and could abandon the effort with notice to Thexton and delivery to Thexton of any work performed up to the time of such notice.
*364 Thus, the document executed by Steiner and Thexton on September 4, 2003, was labeled, "REAL ESTATE PURCHASE CONTRACT." (A copy is attached as an appendix.) It stated in part:
"Martin A. Steiner and/or Assignee, hereinafter called `Buyer,' offers to pay to FAS Family Trust, Paul Thexton, hereinafter called `Seller', the purchase price of Five Hundred Thousand Dollars ($500,000.00) for 10 acres of a 12.29 acre property situated in the County of Sacramento . . . hereinafter called `Property' . . . .
"TERMS OF SALE:
"1. Upon Seller's acceptance escrow shall be opened and $1,000.00 . . . shall be deposited by Buyer, applicable toward purchase price.[2]
"2. During the escrow term, Seller shall allow Buyer an investigation period to determine the financial feasibility of obtaining a parcel split for development of the Property. Buyer shall have no direct financial obligation to Seller during this investigation period as Buyer will be expending sums on various professional services needed to reach the financial feasibility determination. Buyer hereby warranties that all fees shall be paid for said professional services by Buyer and neither the Seller nor the Property will in any way be obligated or indebted for said services. [¶] . . . [¶]
"5. Buyer will pay for the required civil engineering and surveying for the entire parcel map. Any agency requirements of Seller's remaining 2.29 acre parcel will be paid by Seller. Any agency requirements for planning, development or entitlement of the 10 acre parcel will be paid by Buyer. [¶] . . . [¶]
"10. If any condition herein stated has not been eliminated or satisfied within the time limits and pursuant to the provisions herein, or if, prior to close of escrow, Seller is unable or unwilling to remove any exceptions to title objected to, and Buyer is unwilling to take title subject thereto, then this Contract shall at the end of the applicable time period, become null and void. [¶] . . . [¶]
"17. Buyer hereby agrees to purchase the above-described Property for the price and upon the terms and conditions herein expressed. . . . [¶] . . . [¶]
*365 "CONTINGENCIES:
"The Buyer shall have from date of acceptance until the closing of escrow to satisfy or waive the items listed herein below:
"1. Seller is aware that Buyer plans to subdivide, apply for planning entitlements and develop 10 acres from the existing parcel and agrees to cooperate, as needed, with Buyer as Buyer attempts to obtain the necessary permits and authorizations from the various local jurisdictions.
"2. Buyer, at his sole option and expense, will conduct all necessary investigations, engineering, architectural and economic feasibility studies as outlined earlier in this Contract.
"3. Both Buyer and Seller understand that Buyer could have substantial investment during this development period.
"4. Buyer shall hereby indemnify and hold Seller harmless for any acts, errors or omissions of Buyer or Buyer's agents; and Buyer and Buyer's agent hereby agree that, upon the performance of any test, they will leave the Property in the condition it was in prior to those tests.
"5. By acceptance of this offer, the Seller has granted Buyer and/or Buyer's agents, the right to enter upon subject Property for the purpose of conducting said tests and investigations.
"6. Buyer shall indemnify and hold Seller harmless for any costs associated with Buyer's investigations. In the event that this contract is terminated prior to the close of escrow, Buyer shall deliver to Seller the originals or copies of all information, reports, tests, [etc.]
"7. It is the intent of Buyer that the time period from execution of this contract until the closing of escrow is the time that will be needed in order to be successful in developing this project. It is expressly understood that the Buyer may, at its absolute and sole discretion during this period, elect not to continue in this transaction and this purchase contract will become null and void.
"CLOSE OF ESCROW:
"Upon successful completion of subdividing the 10 acres from the existing parcel, Buyer will pay Seller the balance of the purchase price to escrow and close immediately.
"Buyer will move expeditiously with the parcel split. It is anticipated it will take one to three years, due to existing governmental requirements.
*366 "Buyer will give quarterly reports to Seller as to progress of the parcel split.
"If parcel split is not completed by September 1, 2006, this real estate purchase contract will be cancelled." (Italics added.)
Steiner began pursuing the necessary county approvals and (with his partial assignee, Siddiqui) ultimately expended thousands of dollars in this endeavor.[3]
Steiner and Thexton signed an addendum to the "contract" in January 2004. The addendum allowed Steiner to purchase up to 10.17 acres (as opposed to the 10 acres in the original agreement), with a concomitant increase in price. The addendum also deleted original requirements that Steiner grant an easement to Thexton and not build within 100 feet of Thexton's home, and called for Steiner to demolish some old buildings and provide a standard water hookup at no cost to Thexton.[4]
In May and August 2004, Thexton cooperated with Steiner's efforts by signing, as property owner, (1) Siddiqui's application to the county planning department for a tentative parcel map, and (2) a letter stating an existing structure on the property had no historical significance and would be razed.
In October 2004, Thexton asked the title company to cancel escrow.[5] When Steiner inquired, Thexton said he no longer wanted to sell the property. Steiner nevertheless proceeded with the final hearing of the parcel review committee and apparently obtained approval for a tentative map (evidence which the trial court admitted as going to Steiner's state of mind). Steiner opposed the cancellation of escrow and filed this lawsuit seeking specific performance. The escrow agent continued to hold the money pending trial of this lawsuit.
Following the bench trial, the trial court issued a statement of decision, stating in part:
"Th[e] contract is unenforceable against Defendant Paul Thexton because it is, in effect, an option that is not supported by any consideration. [¶] . . . [¶]
*367 "[T]he contract must be construed as an option contract because defendant bound himself to sell the subject property to plaintiff at a stated price for an undefined period of up to three years (described in the contract as the `investigation period'), while plaintiff retained the `absolute and sole discretion' to elect not to continue in the transaction at any time during that period, in which case the purchase contract would become `null and void.' The unilateral nature of this agreement is the classic feature of an option. . . .
"Based on the evidence and the language of the contract itself, the Court finds that the option was not supported by consideration. There was no evidence that any money was paid directly to defendant for his grant of the option to purchase the property, or that defendant received any other benefit or thing of value in exchange for the option. As provided in the contract, plaintiff did deposit $1,000 into an escrow account (and subsequently, plaintiff-in-intervention placed another $1000 into the same escrow account), but the contract provided (Terms of Sale, par. 1) that such payment was to be applicable to the purchase price, and was not for the grant of an option. That this payment was not for the option is confirmed by the fact that plaintiff was under no contractual obligation to remit the $1000 (or $2000) to defendant upon termination of the escrow.
"Plaintiff contends that the work that was done, and expenses incurred, in preparing for the parcel split, conferred a benefit upon defendant, or at least constituted a prejudice assumed by plaintiff, such that such work and expenses amount to consideration sufficient to support the contract. This contention must be rejected. The evidence did not support the contention that any work plaintiff did in furtherance of the parcel split conferred any actual benefit on defendant. To the extent that such work imposed a burden or prejudice upon plaintiff, the contractual language refutes the concept that it was intended to be or should be seen as consideration for the option, because notwithstanding any such work or expense he might undertake, plaintiff still retained the absolute discretion to elect not to continue in the transaction at any time. Consideration must be measured as of the time the contract is entered into. [Citation.] At the time the subject contract was entered into, as at all relevant times, plaintiff could have elected not to continue with the purchase without undertaking any work or expense at all. In fact, plaintiff had not bound himself to do anything, and thus had provided no consideration for the option. Plaintiff has also described as consideration certain additional provisions contained in the purchase agreement itself (i.e. the obligations to `move expeditiously with the parcel split,' to `give quarterly reports to Seller as to the progress of the parcel split,' to `indemnify . . . Seller . . . for any costs associated with Buyer's investigations,' and to `deliver to Seller the originals or copies of all information' gathered in his investigations if the contract were terminated). These matters still do not constitute consideration for the option. First, plaintiff had the contractual right to terminate the *368 contract at any time, which may well have been before any of these items were undertaken. We cannot look with hindsight to find consideration in some obligation which plaintiff may have undertaken, even though not compelled to undertake. [Citation.] Second, the very items which plaintiff describes as obligations were subject to his own language that he could cancel the contract at any time, for any reason, at which time the contract would be null and void.
"The Court likewise rejects plaintiff's claim that in the absence of consideration for the option, his actions constituted a consideration substitute and thus the Court should apply the doctrine of promissory estoppel to avoid injustice. Neither plaintiff nor plaintiff-in-intervention pleaded or otherwise sought promissory estoppel in his or its complaint, and neither sought to amend at any time thereafter. A prerequisite for maintaining a claim for promissory estoppel is that `the party claiming estoppel must specifically plead all facts relied on to establish its elements.' [Citation.] Even if the Court were to consider the equities involved over and above the pleading and proof requirements, plaintiff cannot establish a claim for promissory estoppel for the reasons set forth above: even if his actions following the execution of the contract could give rise to a claim for promissory estoppel, these actions are not tied to the consideration necessary for the option itself. Plaintiff retained his ability to walk away from the contract at any time and therefore the elements of the doctrine are not satisfied."
The trial court entered judgment in favor of defendant.
Thexton then filed a motion for contractual attorney's fees (Civ. Code, § 1717), as we describe post. The trial court granted the motion and awarded attorney's fees in favor of Thexton, as against both Steiner and Siddiqui.
Steiner and Siddiqui appeal from the judgment and attorney's fee award. Siddiqui filed the appellate brief, in which Steiner joined.

DISCUSSION

I. Standard of Review

Plaintiffs contend all issues on appeal present issues of law subject to de novo review. Thexton says the appeal involves a mix of questions of fact and law.
The interpretation of the contract, which does not involve conflicting extrinsic evidence, is a question of law subject to de novo review. (Parsons v. Bristol Development Co. (1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839].)
*369 As to the question of adequacy of consideration, Thexton cites Chalmers v. Raras (1962) 200 Cal.App.2d 682 [19 Cal.Rptr. 531], which said that adequacy of consideration "`"is always peculiarly a question of fact for the trial court to determine, in the light of all the facts and circumstances of each particular case."'" (Id. at p. 689.) Plaintiffs reply that where, as here, the facts are not in dispute, the appellate court faces a question of law and is not bound by the trial court's findings. (Crocker National Bank v. City and County of San Francisco (1989) 49 Cal.3d 881, 888 [264 Cal.Rptr. 139, 782 P.2d 278].) As will appear, even under a de novo standard, there was no adequate consideration in this case.
The attorney's fee award is subject to review under an abuse of discretion standard. (PLCM Group, Inc. v. Drexler (2000) 22 Cal.4th 1084, 1095-1096 [95 Cal.Rptr.2d 198, 997 P.2d 511].) Plaintiffs again assert their challenge presents a question of law on undisputed facts, and again plaintiffs' challenge fails under either standard.

II. The Contract Is a Disguised, Unenforceable Option

Plaintiffs argue the trial court erred in concluding the "REAL ESTATE PURCHASE CONTRACT" was really a disguised option, unenforceable due to lack of consideration. We shall conclude (a) the agreement, despite its label as a real estate purchase contract, was really an attempt to create an option agreement; and (b) the attempt to create an option failed due to lack of consideration, such that the "contract" was nothing more than a continuing offer to sell which could be revoked by Thexton at any time.

A. Disguised (Attempted) Option

(1) That the document called itself a "REAL ESTATE PURCHASE CONTRACT" is not dispositive; the law looks through the form to the substance. (Welk v. Fainbarg (1968) 255 Cal.App.2d 269, 272-273 [63 Cal.Rptr. 127].)
"When by the terms of an agreement the owner of property binds himself to sell on specified terms, and leaves it discretionary with the other party to the contract whether he will or will not buy, it constitutes simply an optional contract." (Johnson v. Clark (1917) 174 Cal. 582, 586 [163 P. 1004].) Johnson held the agreement was an option rather than a sales contract, despite the facts that (1) the would-be buyer paid $100, which he would lose if he refused to buy the mining property, and (2) he took possession of the property with his employee in order to examine it and prospect it for the purpose of determining whether he would buy it. (Id. at p. 586.)
*370 (2) An option to purchase property is "a unilateral agreement. The optioner offers to sell the subject property at a specified price or upon specified terms and agrees, in view of the payment received,[6] that he will hold the offer open for the fixed time. Upon the lapse of that time the matter is completely ended and the offer is withdrawn. If the offer be accepted upon the terms and in the time specified, then a bilateral contract arises which may become the subject of a suit to compel specific performance, if performance by either party thereafter be refused." (Auslen v. Johnson (1953) 118 Cal.App.2d 319, 321-322 [257 P.2d 664].)
(3) There is a difference between an option and the exercise of the option which results in a contract of purchase and sale. Thus, "[a]n option may be viewed as a continuing, irrevocable offer to sell property to an optionee within the time constraints of the option contract and at the price set forth therein. It is, in other words, a unilateral contract under which the optionee, for consideration he has given, receives from the optioner the right and the power to create a contract of purchase during the life of the option. `An irrevocable option is a contract, made for consideration, to keep an offer open for a prescribed period.' [Citation.] An option is transformed into a contract of purchase and sale when there is an unconditional, unqualified acceptance by the optionee of the offer in harmony with the terms of the option and within the time span of the option contract. [Citation.]" (Erich v. Granoff (1980) 109 Cal.App.3d 920, 927-928 [167 Cal.Rptr. 538].)
Here, the agreement was an (attempted) option in which defendant bound himself to sell on specified terms and left it discretionary with Steiner whether he would or would not buy the property.
Plaintiffs argue the agreement was not an option, because nothing in the agreement required Thexton to keep the property off the market for the three-year term of the contract. However, plaintiffs continue on to defeat their own argument, by saying the agreement did not require Thexton to keep the property off the market "if Buyer decides to cancel the Contract at any time before September 1, 2006." Of course, if plaintiffs cancelled the option, Thexton would no longer be bound by it. But while it was still in effect (if it was a valid option supported by consideration), Thexton could not sell the property to anyone else.
Plaintiffs argue the contract required Thexton to keep the property off the market only as long as plaintiffs moved forward "expeditiously" with the government approvals. However, despite plaintiffs' assertion that Thexton could have sued them if they failed to act expeditiously, the promise to act *371 "expeditiously" was an unenforceable promise, since the agreement did not require plaintiffs to move forward at all. The same applies to Steiner's promise to pay for the investigations and applications for the county approvals. This was an unenforceable promise because he had to pay only if he went forward seeking the county approvals. The agreement did not require him to move forward.
(4) We conclude the agreement was not a contract of purchase and sale, but was rather an unsuccessful attempt to create an option, which in any event was never exercised by plaintiffs. Plaintiffs are incorrect in saying they exercised the option by pursuing the county approvals. The flaw in their position is evident from their assertion that they "had already accepted the offer" when Thexton tried to revoke. However, under the express terms of the agreement, their "acceptance" remained subject to contingencies which had not been satisfied, such as county approval, and they remained free to walk away.
We now turn to the question whether Thexton was entitled to withdraw from the deal.

B. Option Unenforceable Due to Lack of Consideration

Plaintiffs argue that, even if the contract was a disguised option, the trial court erred in concluding the option was unenforceable due to lack of consideration. We disagree with plaintiffs.
(5) To be enforceable, an option, like any contract, must have consideration. (Civ. Code, § 1550 [elements essential to existence of contract include a sufficient cause or consideration].) Thus, "`[a]n agreement for an option not based upon consideration is simply a continuing offer which may be revoked at any time.' [Citation.]" (Kelley v. Upshaw (1952) 39 Cal.2d 179, 191 [246 P.2d 23].) "An option based on consideration, whether it be the proverbial peppercorn or some other detriment, is itself a binding contract. . . and is mutually enforceable. [Citations.] In other words, an option based on consideration contemplates two separate cont[]racts, i.e., the option contract itself, which for something of value gives to the optionee the irrevocable right to buy under specified terms and conditions, and the mutually enforceable agreement to buy and sell into which the option ripens after it is exercised. Manifestly, then, an irrevocable option based on consideration is a contract. . . . [¶] On the other hand, an option without consideration is not binding on either party until actually exercised, and is not a contract in the traditional sense, nor is it a contract under section 1550 of the Civil Code. In short, `[i]t is essential to the existence of a contract that there be sufficient cause or consideration, for a promise unsupported by consideration has no *372 binding force. . . .' [Citations.] In other words, an option given without any consideration contemplates only one contract, the one which comes into existence after it is exercised. Thus, until exercised such an option is merely `a continuing offer which may be revoked at any time.' [Citations.]" (Torlai v. Lee (1969) 270 Cal.App.2d 854, 858-859 [76 Cal.Rptr. 239].)
Additionally, though not cited by the parties, Civil Code section 3391 provides in part: "Specific performance cannot be enforced against a party to a contract in any of the following cases: [¶] 1. If he has not received an adequate consideration for the contract . . . ."
Thus, the "contract" was nothing more than a revocable offer unless there was consideration.
Plaintiff argues there was consideration. We disagree.
"Consideration" is defined in Civil Code section 1605, which states: "Any benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, is a good consideration for a promise." Civil Code section 1606 states, "An existing legal obligation resting upon the promisor, or a moral obligation originating in some benefit conferred upon the promisor or prejudice suffered by the promisee, is also a good consideration for a promise, to an extent corresponding with the extent of the obligation, but no further or otherwise."
The trial court found plaintiffs paid nothing other than $1,000 each, but that money was not paid for the grant of an option. The "contract" expressly stated such payment was to be applied to the purchase price. If no purchase took place, the money would go back to plaintiffs upon termination of escrow. Plaintiffs cite no evidence and present no argument that Thexton was entitled to keep that money in the event no purchase took place. Steiner testified it was his understanding that the money (which was still being held in escrow pending trial) would go back to him if he decided not to purchase the property.
(6) Plaintiffs argue there was consideration, in that they conducted the investigations, at their own expense, and the contract called for them to turn over the results to Thexton, such that Thexton benefitted from plaintiffs' efforts. However, the agreement did not require them to conduct the investigations at all. As noted by the trial court, "the adequacy of consideration must be determined as of the date of the agreement, and not at the time of performance. [Citations.]" (Drullinger v. Erskine (1945) 71 Cal.App.2d 492, 495 [163 P.2d 48].)
*373 As of the date the agreement was executed, the agreement did not require plaintiffs to do anything (other than pay the deposit toward the purchase price). The agreement stated, "It is expressly understood that the Buyer may, at its absolute and sole discretion during this period, elect not to continue in this transaction and this purchase contract will become null and void." Thus, the agreement required Steiner to assume the expense of the parcel split, but only if he chose to do so. This does not constitute consideration for the option.
Even assuming Thexton specifically negotiated the provision requiring expeditious action by Steiner (though the transcript cited by plaintiffs shows only that Steiner testified Thexton said the provision was important to him), we reject plaintiffs' argument that Steiner's promise to act "expeditiously" constituted consideration for the option and a legal obligation under the implied covenant of good faith and fair dealing. This argument is defeated by the express clause allowing Steiner to walk away without doing anything.
(7) We similarly reject the argument that legal consideration is found in the provision that "[i]n the event that this contract is terminated prior to the close of escrow, Buyer shall deliver to Seller the originals or copies of all information, reports, tests, studies and other documentation obtained by Buyer from independent experts and consultants concerning the Property." In order for these provisions to constitute consideration, they must impose binding legal obligations on Steiner. (Mattei v. Hopper (1958) 51 Cal.2d 119, 122 [330 P.2d 625] [in a contract where consideration consists of mutual promises, and the promise of one party is not enforceable, the obligations imposed thereby are not mutual, and consideration is lacking].) Here, the provisions did not impose binding legal obligations on Steiner, because of the clause allowing Steiner to back out of the deal without doing anything at all.
The same applies to the January 2004 addendum to the contract, which added items in the event the sale was consummated but did not alter Steiner's power to withdraw.
Thus, the agreement did not legally bind Steiner to make any expenditures.
We therefore need not address plaintiffs' argument that their expenditures constituted consideration by benefitting the property or Thexton (though we will address this argument in our discussion of promissory estoppel, post).
Plaintiffs cite Bleecher v. Conte (1981) 29 Cal.3d 345 [213 Cal.Rptr. 852, 698 P.2d 1154], which found mutuality of obligations in a real estate contract that required the buyers to "`proceed with diligence'" and "`do everything in their power to expedite the recordation of the final map,'" without which *374 the sale would not go forward. (Id. at pp. 350-351.) There, however, "the buyers expressly promised . . . to refrain from withholding their approval unreasonably." (Id. at p. 351.) Bleecher, supra, 29 Cal.3d at p. 351, distinguished a case (Sturgis v. Galindo (1881) 59 Cal. 28) where enforcement was denied because the land sale contract gave one party the right to withdraw at its discretion.
Here, we have a case more like Sturgis than Bleecher, because here the agreement expressly gave Steiner the right to walk away at his discretion for no reason whatsoever.
Though not mentioned by the parties, we note Civil Code section 3386 states, "Notwithstanding that the agreed counterperformance is not or would not have been specifically enforceable, specific performance may be compelled if: [¶] (a) Specific performance would otherwise be an appropriate remedy; and [¶] (b) The agreed counterperformance has been substantially performed or its concurrent or future performance is assured or, if the court deems necessary, can be secured to the satisfaction of the court." The statute, as amended in 1969, "discarded the rigid requirement of mutuality in favor of a flexible rule that allows courts to ensure equity is done to both parties." (Converse v. Fong (1984) 159 Cal.App.3d 86, 92 [205 Cal.Rptr. 242].) We need not consider this matter, because plaintiffs do not invoke Civil Code section 3386 and do not contend Thexton could have compelled specific performance against plaintiffs. To the contrary, plaintiffs merely claim (without supporting authority) that, if they failed to move expeditiously, Thexton could have sued for monetary damages, which they assert would have been de minimis in any case.
Plaintiffs cite a federal case, Fosson v. Palace (Waterland), Ltd. (9th Cir. 1996) 78 F.3d 1448, which cited Bleecher v. Conte, supra, 29 Cal.3d 345, for the propositions that (1) an implied covenant of good faith and fair dealing is implied in every contract, and (2) if a contract is capable of two constructions, the court must choose an interpretation that will make the contract binding if it can be done without violating the parties' intentions. (Fosson, supra, 78 F.3d at p. 1454.)
The federal Fosson case is not binding on us (Nagel v. Twin Laboratories, Inc. (2003) 109 Cal.App.4th 39, 55 [134 Cal.Rptr.2d 420]), and in any event, it is distinguishable. It involved a license agreement pursuant to which the defendants, film producers, agreed to pay a fee of $1,250 to the plaintiff, a musician, if the defendants used his composition in their film (which they did). However, the lawsuit was not an action to enforce the contract, but rather a copyright infringement action brought by the composer, who sought $10,000 in damages based on the defendants' delay in paying the $1,250 *375 license fee. (Id. at p. 1450.) The composer argued the license lacked consideration because the producers were not obligated to use the composition, and the composer rescinded the license due to the producers' failure to pay. (Id. at pp. 1453, 1455.) Fosson rejected the arguments, stating that, even though use of the composition was within the producers' discretion and control, a valid contract arose by virtue of the obligations the producers agreed to assume in the event they used the composition. Also, they were under an implied obligation to act fairly. (Id. at p. 1454.) There was no rescission because the agreement contained a provision pursuant to which the composer expressly waived his right to rescind the agreement. (Id. at p. 1455.) Therefore, the composer could not recover for copyright infringement. (Id. at pp. 1454.)
Later in their brief, under a subheading that the agreement is enforceable even if considered an option agreement, plaintiffs cite Patty v. Berryman (1949) 95 Cal.App.2d 159 [212 P.2d 937], that ambiguous agreements should be interpreted to be bilateral rather than unilateral. Here, however, the agreement was not ambiguous. Even if it were ambiguous, the ambiguity would be construed against Steiner, as drafter of the document. (Civ. Code, § 1654; Zipusch v. LA Workout, Inc. (2007) 155 Cal.App.4th 1281, 1287 [66 Cal.Rptr.3d 704].)
We conclude the agreement was an unsuccessful attempt to create an option and was therefore merely a revocable offer.

C. Estoppel

Plaintiffs argue their actual performance in reliance on the contract provided any missing consideration under the doctrine of promissory estoppel. They argue they completed between 75 and 90 percent of the work needed for the county approvals by the time Thexton tried to cancel the escrow. We shall explain there is no basis for reversal.
(8) The trial court first stated plaintiffs' failure to plead estoppel precluded them from raising the issue. However, the case cited by the trial court (Smith v. City and County of San Francisco (1990) 225 Cal.App.3d 38, 48 [275 Cal.Rptr. 17]) involved a dismissal following a demurrer, not a judgment following trial. A defect in the pleading is not controlling where the issue has been developed at trial. (Frank Pisano & Associates v. Taggart (1972) 29 Cal.App.3d 1, 16 [105 Cal.Rptr. 414].) We therefore do not rest our opinion on the pleading defect.
The trial court went on to say the court would deny the estoppel argument anyway, because plaintiffs' actions following execution of the contract were *376 not tied to the consideration necessary for the option itself, and they always retained the ability to walk away from the contract at any time.
(9) The elements of promissory estoppel are as follows: "`A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.'" (C & K Engineering Contractors v. Amber Steel Co. (1978) 23 Cal.3d 1, 6 [151 Cal.Rptr. 323, 587 P.2d 1136], adopting Rest., Contracts, § 90.[7]) "`[P]romissory estoppel is a peculiarly equitable doctrine designed to deal with situations which, in total impact, necessarily call into play discretionary powers . . . .'" (C & K Engineering, supra, 23 Cal.3d at p. 7, italics omitted.)
Here, plaintiffs cite Steiner's testimony that he "relied on [Thexton's] promise to sell [him] the property." However, plaintiffs fail to show any injustice in denying enforcement of the agreement. As the trial court observed in denying promissory estoppel, Steiner retained the ability to walk away from the agreement at any time. Steiner gave himself this power in the agreement, which he drafted. There is no injustice in a resolution of this case that effectively accords the reciprocal right to Thexton.
(10) Looking at the equities, we see that, although Steiner and Siddiqui spent thousands of dollars in pursuing the county approvals, they did so at their own risk and for their own benefit. Although plaintiffs assert the only risk they intended was that the county might refuse to approve the parcel split, this intent does not appear in the written document, and any ambiguity would be resolved against Steiner as the drafter of the document. (Civ. Code, § 1654; Zipusch v. LA Workout, Inc., supra, 155 Cal.App.4th at p. 1287.)
Despite the clause requiring Steiner to turn over his work product regarding the parcel split in the event the agreement was terminated, and even assuming plaintiffs' efforts increased the value of the property, plaintiffs fail to substantiate their insinuation that Thexton wanted the county approvals as much as plaintiffs did and deliberately waited until plaintiffs did the work before cancelling the agreement.
Thus, according to Steiner's own testimony, it was Steiner who initiated the idea of this agreement, by writing one or two notes to Thexton expressing interest in buying the property. Thexton did not respond at all. Steiner then approached Thexton in person. Thexton said he received a lot of such *377 inquiries but did not respond to them. Thexton said he might consider selling a portion of the property, but he had never split property before and did not know how it was done. Thexton also expressed concern about maintaining his privacy. Steiner said he would handle the parcel split. Over time, they negotiated the number of acres, with Steiner insisting he wanted 10 acres and rejecting Thexton's proposal for eight acres. Steiner, who is a contractor as well as a developer, gave Thexton referrals of persons to help with home improvement. Thexton later expressed his thanks and said he felt badly because he wanted a million dollars for the property, which he thought was more than Steiner wanted to pay. Steiner said he would pay $500,000 and do the work necessary for the parcel split. Thexton later called and said he had received an offer of $750,000 but would prefer to sell to Steiner because of the help Steiner gave for the home improvement. Steiner said he was not willing to pay more than $500,000. Thexton later called and said the $750,000 deal fell through because the buyer wanted Thexton to handle the parcel split. Thexton asked if Steiner was still interested, and Steiner said yes. They talked about terms. Steiner drafted the document. Thexton said he planned to show it to his lawyer. Thexton later asked for changes, to which Steiner agreed, regarding matters such as an easement and mineral rights.
Thexton testified the property has been in his family since 1944, and he has resided there most of his life and planned to continue living there.
In sum, even assuming plaintiffs' efforts increased the value of the property, the equities do not support compelling Thexton to sell the property.
This case is distinguishable from plaintiffs' cited authority, e.g., Drennan v. Star Paving Co. (1958) 51 Cal.2d 409 [333 P.2d 757], which held a paving company could not withdraw its bid to do certain paving work at a certain price, after the general contractor used the bid and was awarded a general contract. There, however, the agreement between the general contractor and the paving company was silent as to revocation. (Id. at p. 413.) Here, the agreement spoke of revocation, but gave that right only to Steiner, not to Thexton. The agreement was drafted by Steiner.
We conclude the equities do not warrant application of promissory estoppel in this case.
We parenthetically observe plaintiffs try to distort a comment of the trial court, by suggesting it supports their estoppel argument. They quote the judge's comment: "He [Thexton] obstructed the thing and he canned the whole program and that's about all you need. [¶] . . . [¶] . . . He did it at the time when it was all finished, virtually. There was nothing more to do but sign his name." However, the context of the cited quote shows the judge was *378 merely indicating he understood plaintiffs' position, and it was unnecessary for them to adduce a lot of evidence about their claim that Thexton failed to cooperate with the county approvals after he gave notice to cancel escrow. The judge said, "rather than get into all this, can't we just assume that he did obstruct the completion of this transaction." Thus, the trial court's comment does not support plaintiffs' position.
We conclude plaintiffs' promissory estoppel argument does not provide a basis for reversal.
We conclude plaintiffs fail to show grounds for reversal of the judgment.

III. Attorney's Fees

Plaintiffs contend Thexton's motion for attorney's fees failed to provide sufficient evidence for the award, because the motion lacked sufficient evidence as to how many hours were reasonably spent and on what issues. We shall conclude plaintiffs fail to show grounds for reversal.

A. Background

Thexton filed a motion for attorney's fees (Civ. Code, § 1717), based on the contract clause in paragraph 17 under "TERMS OF SALE," that "[i]n the event any litigation or other legal proceedings are instituted to enforce or declare the meaning of any provision of this Contract, the prevailing party shall be entitled to its costs, including reasonable attorneys fees."
In support of the motion, Thexton's attorney submitted a declaration stating in part that "from the inception of this file to date, I have expended a total of 271.0 hours incident to this mat[t]er. Of that time, approximate[ly] 21 hours were spent incident to the proceedings subsequent to receipt of the court's intended decisioni.e., drafting and preparing the statement of decision, opposing the plaintiffs' opposition thereto, and preparing the request for court costs and this motion for attorneys' fees. (The actual time spent following the entry of judgment is actually higher but I have not added that time to these applications. . . .) Excluding that particular post-trial time for the moment, of the total time through entry of the court's intended decision, 79% (or 197.9 out of 250.4 hours) was spen[t] subsequent to the court's mandatory settlement conference. In other words, the vast majority of the total attorney time was spent in the last few weeks before trial, in the depositions of trial experts, in the preparation and completion of the trial itself, and in the post trial steps including preparation of the statement of decision and judgment. In addition, I tracked 33.2 hours of legal assistant time and 115.8 hours of law clerk time related to this file. (I only tracked *379 such time if the efforts undertaken by my staff involved matters which I otherwise would have to have completed if they were not performed by others.) The legal assistant time was billed at the rate of $60.00 per hour. The law clerks who assisted on this file were primarily responsible for trial preparation, research incident to the trial brief and outlines of anticipated trial testimony, preparation of the memorandum of costs, and preparation of the post trial pleadings. Of the total law clerk time spent on this file, I wrote off 31.9 hours. In other words, no one was billed for that time. The law clerks' time was otherwise billed at $90.00 per hour (even though one of them has since passed the California bar exam). (I also used an outside or `contract attorney' for one project incident to this file. She billed me a total of 19 hours for which I wrote off 3.2 and billed Mr. Thexton 15.8 at $175.00/houreven though this attorney has been a member of the bar since 1988.)" (Emphasis omitted.) The declaration stated in a footnote: "This litigation involved a real estate breach of contract with claims for specific performance, damages and restitution. It involved complex income tax issues and the effects of a tax-deferred 1031 exchange.[8] It involved an intervening plaintiff who waited until the literal last moment to intervene, causing a delay in the trial proceedings and significant last minute discovery concerning the 1031 exchange, the alleged damages and lack-of-mitigation defenses. The plaintiffs' contentions necessitated expertise (on the part of defense counsel) in land use development, real estate acquisition, and the terms and conditions typically part of commercial property development. The contractual defenses asserted by the defendant involved lack of mutual assent, lack of ability to contract, lack of consideration, and the literal plethora of related evidentiary concerns." The declaration stated in another footnote that the client billing statements contained privileged communications, but counsel would make the billings available to the court for in camera review. The declaration said a summary identifying the total time spent month by month was attached as an exhibit (which we do not find in the superior court file).
The motion sought a total of $104,683.70.
Steiner and Siddiqui opposed the motion for attorney's fees. They argued the amount was excessive; the fees were inadequately documented; the referenced exhibit was not submitted; and the amount included fees incurred on issues on which defendant did not prevail. Steiner and Siddiqui also filed a motion to tax costs (challenging expert witness fees as a cost element while acknowledging they may be recoverable with attorney's fees).
*380 In reply, Thexton's attorney submitted a supplemental declaration describing some of the proceedings.
On January 23, 2007, the trial court denied the motion to tax costs and granted defendant's motion for attorney's fees, though not for the requested amount of $104,683. Applying the "lodestar" formula (multiplying number of hours reasonably expended by reasonable hourly rate), the court ruled defendant was entitled to an attorney's fee award in the amount of $85,279.
The court's ruling stated in part:
"2. Based on its familiarity with the issues raised and tried in this matter, which consumed seven full days of trial and involved complex legal and factual matters such as the characterization of the contract as an option unsupported by consideration (the issue which eventually proved to be dispositive), defendant's alleged lack of capacity to enter into the contract, and plaintiff-in-intervention's potential claim for damages based on a Section 1031 exchange, the Court finds that the time claimed for work performed by defendant's counsel, David L. Price, and by others working under his direction . . . were directly connected with the litigation, are reasonable and are not excessive.
"3. The time expended by Mr. Price and those working under his direction are documented adequately for the purposes of this motion in Mr. Price's Declaration and Supplemental Reply Declaration. Given the Court's ruling that the time spent on this matter was reasonable in the particular context and circumstances of this case, detailed line-item billing sheets are not necessary. (See, Weber v. Langholz (1995) 39 Cal.App.4th 1578, 1587 [46 Cal.Rptr.2d 677].)"
The trial court awarded a total of $85,279, calculated as follows: 232 hours at $250 per hour; 44 hours at $275 per hour; legal assistants' time of 33.2 hours at $60 per hour; law clerks' time of 115.8 hours at $90 per hour; and a contract attorney's time of 15.8 hours at $175 per hour.
As to plaintiffs' motion to tax costs in the amount of $5,560 for expert witness fees, the trial court's ruling stated: "In their motion, [plaintiffs] suggest that they may be prepared to concede that defendant may recover the claimed costs as part of his claim for attorney's fees. California law does provide that disbursements of counsel for the fees of expert witnesses and consultants may be recoverable as a component of attorney's fees recovered under a contract pursuant to Civil Code section 1717, notwithstanding the fact that expert witness fees may not be recoverable as ordinary costs under Code of Civil Procedure section 1033.5. [Citation.] [¶] Defendant's claim for *381 expert witness fees as an element of costs therefore may have been technically incorrect, but defendant is nonetheless entitled to recover such disbursements in this case as part of the attorney's fees award. Plaintiff's motion to tax these costs is therefore denied."

B. Analysis

As indicated, the attorney's fee award is subject to review under an abuse of discretion standard (PLCM Group, Inc. v. Drexler, supra, 22 Cal.4th 1084, 1095-1096), but plaintiffs contend their challenge presents a question of law subject to de novo review. We conclude that, under either standard, plaintiffs fail to show grounds for reversal.
(11) "`[T]he fee setting inquiry in California [including Civil Code section 1717 fees] ordinarily begins with the "lodestar," i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate. . . . The lodestar figure may then be adjusted, based on consideration of factors specific to the case . . . . Such an approach anchors the trial court's analysis to an objective determination of the value of the attorney's services, ensuring that the amount awarded is not arbitrary.'" (Ketchum v. Moses (2001) 24 Cal.4th 1122, 1134 [104 Cal.Rptr.2d 377, 17 P.3d 735], citation omitted; see PLCM Group, Inc. v. Drexler, supra, 22 Cal.4th at pp. 1096-1097 [lodestar approach applies to Civ. Code, § 1717 fees in absence of contract provision as to how to calculate fees].) "The `"experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong."' [Citation.]" (Ketchum, supra, 24 Cal.4th at p. 1132.)
Plaintiffs contend they were entitled to sufficient information about how and when defense counsel incurred all the fees in order to allow plaintiffs to identify items that potentially should not be recoverable.
A similar contention was rejected in Weber v. Langholz, supra, 39 Cal.App.4th 1578, which in the course of affirming an attorney's fee award stated: "Plaintiff complains that counsel did not state the total number of hours nor substantiate the hours or amounts with copies of time records or copies of billing statements. Counsel's declaration and verified cost memorandum were, however, made under penalty of perjury. Mathematical calculation could show the number of hours was between 90 and 103. The work done was described. The trial court could make its own evaluation of the reasonable worth of the work done in light of the nature of the case, and of the credibility of counsel's declaration unsubstantiated by time records and billing statements. Although a fee request ordinarily should be documented in *382 great detail, it cannot be said in this particular case that the absence of time records and billing statements deprived the trial court of substantial evidence to support an award; we do not reweigh the evidence. [Citation.]" (Id. at p. 1587.)
Plaintiffs argue Weber is distinguishable because it involved less money (an initial request of $18,075), and the work done was described. However, here too, the work done was described in counsel's declaration (even though there is a question whether a referenced exhibit was actually submitted). That this case involves more money does not support reversal. Plaintiffs argue defendant's attorney spent 50 hours more on the case than either of plaintiffs' attorneys, despite plaintiffs having submitted twice as much briefing as defendant. However, the trial court could and did make its own evaluation.
Plaintiffs argue some of the attorney's fees were incurred on issues on which Thexton did not prevail or for issues for which attorney's fees were not recoverable. However, plaintiffs fail to identify any such issues in their appellate brief, other than one amount which the trial court excluded from the award and which therefore affords plaintiffs no basis for appeal. To the extent plaintiffs want to talk about the expert witness fees, they have forfeited the matter by failing to assign error or present any factual or legal analysis as to the trial court's denial of plaintiffs' motion to tax those costs. (People v. Turner (1994) 8 Cal.4th 137, 214, fn. 19 [32 Cal.Rptr.2d 762, 878 P.2d 521] [reviewing court may disregard contentions not adequately briefed].) To the extent plaintiffs might be trying to argue (without development) that Thexton should not be allowed attorney's fees for defenses which ultimately were not dispositive, such as the issue of alcoholism, the argument would fail because plaintiffs did not prevail on those issues either, and they fail to show any abuse of discretion in the trial court making the award without trying to separate out fees for each affirmative defense. (See, e.g., Downey Cares v. Downey Community Development Com. (1987) 196 Cal.App.3d 983, 997 [242 Cal.Rptr. 272] [trial court has discretion to award all or substantially all of party's attorney's fees, even if court did not adopt each claim raised by the party].)
We conclude appellants fail to show grounds for reversal of the attorney's fee award.

*383 DISPOSITION
The judgment and attorney's fee award are affirmed. Defendant shall recover costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)
Nicholson, J., and Cantil-Sakauye, J., concurred.

*384 APPENDIX

*385 
*386 
NOTES
[1] Plaintiffs engage in a lengthy discussion about evidence concerning other defenses, particularly Thexton's assertion that his alcoholism rendered him unable to enter a meeting of minds, and Steiner took advantage of him. Although plaintiffs claim this evidence is relevant to provide context for the "disguised option" defense upon which the trial court reached its decision. Thexton also wants to talk about alcoholism on appeal. However, it is not relevant to our resolution of this appeal, and we therefore do not discuss this evidence.
[2] The trial court found that, since this money was to be applied to the purchase price, it did not constitute consideration for the option.
[3] Plaintiffs say they spent $60,000. The trial court at one point said it was less. We will assume for purposes of this appeal that plaintiffs spent $60,000.
[4] There is no indication that the addendum required Steiner to do anything as consideration for the option to buy.
[5] Plaintiffs suggest Thexton was influenced by a meddling companion, Michelle James. Since we conclude the agreement was in effect a revocable offer, Thexton's reasons for withdrawing are immaterial.
[6] As we explain post, here there was no payment received for the option.
[7] The provision remains substantially the same in the Restatement Second of Contracts, though the phrase "of a definite and substantial character" has been deleted.
[8] Siddiqui intended to sell other property it owned and use the proceeds to pay for Thexton's property, making use of an Internal Revenue Service "1031 exchange" to defer taxes on the capital gain. Thexton's agreement with Steiner required Thexton to cooperate with IRS 1031 exchanges. Siddiqui sold its property in 2005, after Thexton cancelled his agreement with Steiner in October 2004.